No. 47,094

THE SINGER COMPANY, a New Jersey Corporation, *Appellee*, v. MAKAD, INC., a Nevada Corporation, DAUM INDUSTRIES, INC., a Nevada Corporation, HARRY M. DAUM and KATHLEEN MARY ELLEN DAUM, *Appellants*, and EQUITABLE LIFE ASSURANCE SOCIETY OF THE UNITED STATES, a New York Corporation, THE EQUITABLE LIFE MORTGAGE AND REALTY INVESTORS, a Massachusetts Business Trust, *Defendants*.

(518 P. 2d 493)

Opinion filed January 26, 1973.

*Terry L. Bullock,* of Cosgrove, Webb & Oman, of Topeka, argued the cause, and *Edward Larson,* of Jeter and Larson, of Hays, was with him on the brief for the appellants.

*John R. Cleary,* of Linde, Thomson, Van Dyke, Fairchild & Langworthy, of Kansas City, Missouri, argued the cause, and *Myron L. Listrom,* of Sloan, Listrom, Eisenbarth, Sloan & Glassman, of Topeka, was with him on the brief for the appellee.

The opinion of the court was delivered by

FONTRON, J.: This action is brought under the declaratory judgment statute, K. S. A. 60-1701. It was initiated by The Singer Company, hereafter referred to as Singer or plaintiff, which, as lessee, executed lease agreements for space in two shopping centers, one at North Platte, Nebraska, and the other at Hays, Kansas, under dates of October 17, 1967, and November 22, 1967, respectively. The original lessors were Harry M. and Kathleen Mary Ellen Daum who subsequently, and sometime in April, 1969, assigned their interest in the lease agreements to Daum Industries, Inc., which in turn, and on November 1, 1970, assigned the leases to Makad, Inc., a company in which the Daums held a one-half interest. We shall refer to the present lessor as Makad, to its predecessors in title as the Daums and to them collectively as defendants.

Two bases for relief are advanced by Singer: First, that the leases were void as violating the rule against perpetuities; second, and in the alternative, that Makad and the Daums, its assignors, unreasonably delayed the construction and opening of the two shopping centers. The trial court held that the lease agreements violated the rule against perpetuities and, accordingly, entered judgment in favor of Singer. This appeal followed.

At this time it may be well to record the progress of the shopping center project after the lease agreements were executed in the fall of 1967. In June, 1969, the leases were amended with respect to the base rent, the amount, naturally, being increased. Financing was available on and after May 26, 1971, and the leases were assigned to Equitable Life Assurance Society of the United

States and the Equitable Life, Mortgage and Realty Investors as collateral security about July 29, 1971. Plans and specifications for the centers were completed the latter part of June, 1971; construction was commenced approximately June 1, 1971, and the center was opened April 12, 1972, by which time this lawsuit had been filed. When the case was tried before the district court on May 15, 1972, it was anticipated that the center would be 75 per cent occupied the following August.

The lease agreements, whose terms for present purposes were identical, appear to have been lengthy and detailed, containing twenty articles in all. From the few paragraphs set forth in the record we find each covered a space of 3000 square feet in the respective shopping centers which were to be constructed by the Daums. The base rental, as amended, was $750 per month, plus percentage of sales. The term was for a period of ten years to commence thirty days after the landlord had substantially completed construction. We are given to understand that the leases in question conform generally to the mold of modern shopping center leases and that the plan or method ordinarily used in the development of shopping center areas was followed in this case, which is to say: First, lease agreements are secured from prospective tenants, hopefully including at least one chain concern; second, the required finances are sought and obtained, and the leases assigned as collateral; third, construction is commenced and the project eventually completed.

In concluding that the Singer leases violated the rule against perpetuities the trial court relied on the following specific provisions:

### Article III (a)

"The term of this Lease shall be for a period of ten (10) years commencing upon the date of commencement set forth in Article VII (b) hereof, and shall end on the last day of the tenth (10th) consecutive full lease year as said term 'lease year' is hereinafter defined. The term 'lease year' as used herein shall mean a period of twelve (12) consecutive full calendar months. The first lease year shall begin on the date of commencement of the term hereof if the date of commencement of the term hereof shall occur on the first day of a calendar month; if not, then the first lease year shall commence on the first day of the calendar month next following the date of commencement of the term hereof. Each succeeding lease year shall commence upon the anniversary date of the first lease year.

"Anything in this paragraph to the contrary notwithstanding, it is understood and agreed that Tenant shall not be obligated to open for business in

the demised premises until at least 75% of the other retail tenants of the Center, including J. C. Penney, are open for business."

## Article VII (b)

"When Landlord has substantially erected and completed Landlord's work and the leased premises are ready for Tenant's work and the installation of Tenant's equipment, Landlord shall notify Tenant in writing to that effect, hereinafter called 'the notice date,' and the term of this Lease shall commence (i) thirty (30) days after 'the notice date;' or (ii) the opening by Tenant of its business on the premises, whichever of (i) or (ii) should first occur. Tenant agrees that it shall open the premises for business not later than thirty (30) days after 'the notice date' except as otherwise provided in Article III (a). No rent shall be payable by Tenant to Landlord until said term shall have commenced as herein provided."

## Article VII (e)

"The Landlord shall not be obligated to proceed with the construction of the leased premises unless and until financing acceptable to Landlord is obtained. Should such financing not be obtainable within six (6) months after completion of final plans and specifications for the Shopping Center, Landlord may so notify Tenant in writing, and this lease shall thereupon cease and terminate and each of the parties hereto shall be released and discharged from any and all liability and responsibility hereunder  . . ."

Conclusions of law were formulated and entered by the trial court in the following particulars:

"2. The leasehold interest described in the leases at issue herein did not vest in the plaintiff at the time of the execution of the leases, but on the date of execuion each lease created a leasehold interest for a term of years to commence in the future with the commencement of the term of each lease being dependent upon the occurrence of three uncertain and indefinite events, to-wit:

"a) The condition precedent that Landlord obtain financing acceptable to Landlord;

"b) The condition precedent that Landlord substantially erect and complete the Shopping Centers;

"c) The condition precedent that 75% of the other retail tenants of each Center are open for business.

"3. Each lease at issue herein granted a leasehold interest limited to vest upon the occurrence of certain future events. At the time of the execution of the said leases there was a possibility that these events might not occur within the period prescribed by the Rule Against Perpetuities, and therefore each lease violates the Rule Against Perpetuities and is therefore void and of no effect."

We presume that every student of the law has been familiar at one time or another with the rule against perpetuities which has been handed down to us from the common law. Simply stated, the rule precludes the creation of any future interest in property which does not necessarily vest within twenty-one years after a life or lives

presently in being, plus the period of gestation, where gestation is, in fact, taking place. (*In re Estate of Freeman,* 195 Kan. 190, 195, 404 P. 2d 222; *Lasnier v. Martin,* 102 Kan. 551, 171 Pac. 645.) In Gray, The Rule Against Perpetuities, 4th Edition, 1942, p. 191, the author phrases the rule this way:

"No interest is good unless it must vest, if at all, not later than twenty-one years after some life in being at the creation of the interest."

Where the twenty-one year period has no reference to a life or lives in being, it has been said to be in gross, and the devise or grant is not too remote if the contingency must happen within that time. (*Keeler v. Lauer,* 73 Kan. 388, 85 Pac. 541; *Emerson v. Campbell, et al.,* 32 Del. Ch. 178, 84 A. 2d 148.)

Kansas has long recognized the rule as part of the common law of this state. (*Keeler v. Lauer,* supra; *Klingman v. Gilbert,* 90 Kan. 545, 135 Pac. 682.) Moreover, it has been held that the rule applies to the creation of a term of years in an ordinary farm lease. (*Ehrhart v. Spencer,* 175 Kan. 227, 263 P. 2d 246.) However, Kansas courts have not been called upon to consider application of the rule to a modern commercial lease of the type we have before us which, for want of a better or more descriptive name, may be designated as an "on completion" lease.

The defendants earnestly urge that the rule was never fashioned to apply to a lease of this character; that it has no relevance to the needs of modern business; and that it is an anachronism when it comes to current leasing practices. The defendants further suggest that the recent trend among legal authorities is to relax the harsh and inflexible application of the rule and that most courts are now disposed to follow one of several tenable theories which will avoid remorseless application of the rule and give effect to the intention of the parties. A number of these theories were mentioned and discussed in the *Freeman* decision and need not be repeated here.

We observe a good deal of merit and common sense in the arguments advanced by the defendants. Moreover, we find them explicitly supported by respectable legal authority coming from other jurisdictions, while our own cases reflect the modern tendency to temper the rule where its rigid application would do violence to the disposition of property. (*In re Estate of Freeman,* supra; *In re Estate of Foster,* 190 Kan. 498, 376 P. 2d 784; *In re Estate of Showers,* 207 Kan. 268, 485 P. 2d 299.) In each of the foregoing cases this court excised the provisions of a testamentary trust which would have

violated the rule but otherwise gave effect to what was perceived to be the testator's intended scheme in disposing of his property. In a somewhat earlier case, *Blake-Curtis v. Blake*, 149 Kan. 512, 89 P. 2d 15, we held:

"Where one provision of a will is invalid because it violates the rule against perpetuities, and the testamentary scheme of the testators can be determined and carried out regardless of the void provision, that provision will be stricken out and the testamentary plan given effect." (Syl. ¶ 3.)

While the foregoing decisions are not strictly on all fours with the present case because of factual differences, they illustrate this court's reluctance to extend the infectious invalidity rule to situations where its use is not necessary to prevent a disposition tying up property for a remote period. (See, *In re Estate of Freeman*, supra, p. 197.)

While a few modern authorities would apply the rule to "on completion" leases (*Southern Airways Co. v. DeKalb County*, 101 Ga. App. 689, 115 S. E. 2d 207; *United Va. Bank/Citizens & M. v. Union Oil Co. of Cal.*, 214 Va. 48, 197 S. E. 2d 174) we believe the better and far more rational view to be the one which is forcefully expounded in the case of *Wong v. Di Grazia*, 60 C. 2d 525, 35 Cal. Rptr. 241, 386 P. 2d 817. The defendants refer to this rule as the "reasonable time" rule and we deem this an apt and convenient designation.

The California case bears marked similarity to the controversy before us. The parties had executed a written agreement under which the defendant (lessor) was to construct a building and the plaintiffs (lessees) agreed to lease the same for a period of ten years, the term to commence upon the recording by the lessor of a notice of completion. Construction was to commence forthwith agreeably to the attached plans and specifications and was to continue expeditiously to final completion, subject to material or labor shortages, strikes, lockouts, governmental actions and all causes beyond lessor's control. The building was to be completed within 90 days after a building permit was obtained by lessor.

Disagreement arose over who was to pay for a sprinkling system required by the building code and the lessees filed suit to rescind the lease and to recover a down payment which had been made. The key issue was whether the agreement violated the rule against perpetuities. The California Supreme Court, in upholding the lease agreement, decided that it did not violate the rule; that the parties must have contemplated the building would be completed

and the lease fully executed within a reasonable time; and that a reasonable time must necessarily be a period far less than twenty-one years.

In the course of its decision the court noted briefly The Duke of Norfolk's case, 3 Ch. Cas. 1, decided in 1682, from which the rule originally stemmed (Simes & Smith, The Law of Future Interests, 2d Ed., 1956, § 1211) and pointed out that its basic purpose was to limit family dispositions of property. The court also observed, quite sagely, that the rule does not "facilely operate as to commercial agreements in today's dynamic economy" and thence proceeded to quote from Leach, Perpetuities in a Nutshell (1938), 51 Harv. L. Rev. 638, 660:

"The period of lives in being and 21 years, which works admirably with regard to gift transactions for family purposes, has no significance in the world of commercial affairs."

Elaborating on the concept that the rule bears little relationship to contemporary business practices or to "the world of commercial affairs", the court went on to say:

"Certainly our function is not to interpret the rule so as to create commercial anomalies. A lease to commence upon completion of the leased building is a common business arrangement. Such a clause is a standard provision of leases in shopping centers, which have been and are being constructed throughout the country; the parties to such transactions do not suspect that rule will be extended to invalidate their agreements; even the attorneys who draw the leases may excusably not anticipate such application. Surely the courts do not seek to invalidate bona fide transactions by the imported application of esoteric legalisms. Our task is not to block the business pathway but to clear it, defining it by guideposts that are reasonably to be expected. As was pointed out in (1959) 47 Cal. L. Rev. 197, 200: '[A] strict and literal application of the Rule Against Perpetuities to a lease of this nature can do little to serve the basic purpose behind the rule and can result only in placing an unnecessary burden on the parties to an accepted commercial transaction.' We therefore do not propose to apply the rule in the rigid or remorseless manner characterized by some past decisions; instead we shall seek to interpret it reasonably, in the light of its objectives and the economic conditions of modern society." (pp. 533, 534.)

The court expressed its disapproval of *Haggerty v. City of Oakland,* 161 Cal. App. 2d 407, 326 P. 2d 957, one of the authorities cited and relied on by Singer, insofar as *Haggerty* held the rule applicable to a lease commencing on the completion of construction. In short, the California court declined, in *Wong,* to give a "rigid mechanistic operation" to the rule against perpetuities or to construe the provisions of the "on completion" lease as violating the rule.

Cases dealing with "on completion" leases are apparently few in number so far as we are able to tell. The California holding is mirrored in *Halifax v. Vaughan Const. Co.*, 9 D. L. R. (2d) 431, while a similar result was obtained in *Isen v. Giant Food, Inc.*, 295 F. 2d 136, although on a somewhat different basis. However, in the *Isen* case, where the "on completion" lease covered a building to be constructed after commercial zoning was obtained, the court said this:

". . . We think, however, that the agreement required that zoning for commercial purposes, if obtained at all, must be obtained within a reasonable time and that such time, in the circumstances of this case, is certainly within the period of perpetuities. . . ." (pp. 137, 138.)

Commenting on the *Isen* decision, an article appearing in 37 Notre Dame Law Review, 561, contained the following passage:

"This opinion is a welcome injection of good sense into an area of commercial law which has been too long muddled. It is common practice to lease space in unconstructed buildings—often before the foundation is laid—to ensure sufficient tenants to make the construction commercially feasible, to obtain payments in advance, and to lend security to backers. The practice is particularly widespread in the shopping center business, where it is a valuable promotion device."

Typical of the accolade accorded the *Wong* decision by the academic world is a dissertation appearing in 12 UCLA Law Review, 246, 253, in which this language may be found:

". . . In no case, however, should the Rule be applicable to 'on completion' leases, as the present decision patently demonstrates. Within the commercial context, this type of lease would never restrict land use for any period approaching twenty-one years. The parties are not related persons with benevolent objectives, but 'opposing' businessmen seeking a profitable transaction. Not only would these parties not contemplate restricting the land for any extended period, but the pecuniary realities of taxes, upkeep expenses and lost profits would virtually compel a termination of the agreement, either by mutual consent or breach, long before the statutory period has run."

It seems generally to be agreed, as our own cases may be said to witness, that the rule against perpetuities should not be applied where it is possible for the court to give an instrument a construction leading to its validity. The rule is phrased in *Wong v. Di Grazia*, supra, in these words:

". . . Both the California cases, and those of a majority of other states, hold that a document should be interpreted if feasible to avoid the conclusion that it violates the rule against perpetuities." (pp. 539, 540.)

Supporting this principle of construction, see Restatement, Prop-

erty, § 375; *Belfield v. Booth,* 63 Conn. 299, 27 A. 585; *Edgerly v. Barker,* 66 N. H. 434, 31 A. 900; *Plummer v. Roberts,* 315 Mo. 627, 287 S. W. 316.

We think it not unreasonable to assume that in the hurried, competitive atmosphere of today's commercial world, experienced business people dealing at arm's length for rental space in any modern shopping area would not contemplate entering into a lease arrangement contingent on events which might not transpire until twenty-one years had gone by.

The conclusion at which we arrive in this case is consistent with past decisions of this court to the effect that where no time has been stated for performing an act which is to be done, the law will imply that performance is to be accomplished within a reasonable time, and the want of a stipulation as to time does not necessarily render the agreement void. (*Leis v. Sinclair,* 67 Kan. 748, 74 Pac. 261; *Eakin v. Wycoff,* 118 Kan. 167, 171, 234 Pac. 63; *Price v. Brodrick,* 183 Kan. 71, 325 P. 2d 387.)

In *Campbell v. Warnberg,* 133 Kan. 246, 299 Pac. 583, the principle was expressed with respect to the exercise of an option. There, the will executed by the testator provided essentially that his sons, in specified priority, should have the right to purchase their sisters' interest in the real estate, but no time was fixed for exercising the options. The holding of the court on that point is encompassed in Syllabus 1:

"Where a person has an option to purchase property at a specified figure, and no time is fixed for the exercise of the option, a reasonable time is implied, and what length of time is reasonable is governed by the circumstances of the particular case."

A testamentary option to purchase real estate was likewise the subject of controversy in *In re Estate of Maguire,* 204 Kan. 686, 466 P. 2d 358. In that case we said that "where no time limit is specified for the exercise of a testamentary option, it must be exercised within a reasonable time." (p. 690.)

Our cases are consonant with the general rule found in 17 A C. J. S., Contracts, § 503 (1), p. 779:

"Where a contract fixes no definite time for performance the law usually implies that performance shall be within a reasonable time, and this rule applies to the performance of a condition precedent, or of an act dependent on the will of the promisor."

Since we hold the lease agreements are not void *per se,* but that a reasonable time for their performance is implicit in their provi-

sions, the question arises as to what disposition should be made of this appeal.

Obviously, no determination has yet been made as to whether the defendants acted with reasonable dispatch in constructing the shopping centers. The trial court made no findings on this point; its judgment was based on the premise that the lease agreements violated the rule against perpetuities, not that there had been unreasonable delay.

The litigants suggest this court is in a position to determine whether the shopping center projects were completed within a reasonable length of time. We do not agree. Although the record contains a number of letters passing between Singer and the respective lessors, there was also oral testimony which, in our opinion, would have a bearing on the issue of delay. The evidence is not wholly documentary, and we would not be warranted in making findings. (See cases in 1 Hatcher's Kansas Digest [Rev. Ed.], Appeal & Error, § 497.)

Nor can we determine from the record as a matter of law whether the center was constructed within a reasonable time, or whether it was not. What is a reasonable time depends in each case on the surrounding facts and circumstances; it is a matter for the trial court to determine in the first instance, since it heard all the evidence and observed the witnesses. We view the matter of timely performance as presenting an issue of fact concerning which the trial court should make findings.

Under the caption that Singer did not prove the lease was breached by failure of performance within a reasonable time, the defendants cite *Howerton v. Gas Co.,* 82 Kan. 367, 108 Pac. 813, as authority for the proposition that one seeking to rescind a lease must show there is no adequate remedy at law. In our judgment *Howerton* does not preclude us from remanding this case for further consideration. Should the trial court find unreasonable delay on the defendants' part it might conclude from the evidence that damages would suffice to compensate Singer; on the other hand, the court might determine that only recision would give adequate relief. This court recognized these alternatives in remanding the *Howerton* case.

The record is scant with respect to the issue of reasonable performance. We cannot tell, for example, what evidence may have been directed toward the adequacy of damages or whether that issue was presented to the trial court. We do not find this point

clearly set out in the defendants' statement of points, which suggests it may not have been raised at the trial level. We have said many times that questions not presented to the trial court will not be considered on appeal. (See 1 Hatcher's Kansas Digest [Rev. Ed.], Appeal & Error, § 304.)

In our opinion this case must be reversed and returned to the trial court for its determination of whether the lessors' performance was within a reasonable time, and should the court find in favor of Singer then to decide what relief should be afforded in the light of all the circumstances.

It is so ordered.